PEOPLE v JOHNSON

1. CRIMINAL LAW—CONSTITUTIONAL LAW—DELAY IN BRINGING CHARGE.

A criminal defendant cannot complain of delay in bringing charges against him where he has caused the delay himself by avoiding apprehension when he had reason to know a warrant had been issued for his arrest.

2. CRIMINAL LAW—CONSTITUTIONAL LAW—DELAY IN BRINGING CHARGE—PREJUDICE—BURDEN OF PROOF.

A showing of prejudice to defendant resulting from delay in bringing formal charges against him may be overcome by clear and convincing proof that the delay was explainable, it was not deliberate, and no undue prejudice to defendant resulted.

3. CRIMINAL LAW—DELAY IN BRINGING CHARGE—UNDUE PREJUDICE.

Defendant was not unduly prejudiced by the 87-day delay in bringing charges against him where he was able to testify at trial at some length as to the events in issue and where the delay was caused by defendant's avoiding apprehension for 71 days after a warrant was issued for his arrest and made known to defendant's father while defendant was still living at home.

4. CONSTITUTIONAL LAW—RIGHT TO REMAIN SILENT—COMMENT BY PROSECUTOR.

Defendant's assertion of his right to remain silent may not properly be commented upon in the prosecutor's final argument, but such comment must be objected to at trial to be preserved for appeal where no miscarriage of justice results.

Appeal from Saginaw, Hazen R. Armstrong, J. Submitted Division 3 April 4, 1972, at Grand Rapids. (Docket No. 11271.) Decided May 25, 1972.

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 252.

Waiver or loss of accused's right to speedy trial, 57 ALR2d 302.

[2, 3] 21 Am Jur, Criminal Law § 456.

[4] 21 Am Jur 2d, Criminal Law § 353.

Eugene "Blue" Johnson was convicted of assault with intent to do great bodily harm less than murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert. A. Derengoski,* Solicitor General, *George E. Thick,* Prosecuting Attorney, and *Roy DeGesero,* Assistant Prosecuting Attorney, for the people.

*Jerome E. Burns,* for defendant on appeal.

Before: R. B. BURNS, P. J., and HOLBROOK and BORRADAILE,* JJ.

HOLBROOK, J. On December 4, 1970, defendant was convicted of assault with intent to do great bodily harm less than murder. MCLA 750.84; MSA 28.279. He was sentenced on January 13, 1971, and has appealed.

At approximately 2:30 a.m. on the morning of April 12, 1970, one William Dix was shot four times outside a dance hall in Saginaw. A warrant was issued for defendant on April 28, 1970, and he was arrested on July 8, 1970.

Before trial the defendant moved that the case be dismissed because of the delay of 87 days from date of offense to date of arrest. The motion was denied.

At trial, William Dix was the first prosecution witness. Dix testified that on April 11, 1970, he attended a dance with friends including Mattie Strickland and James Carpenter. At approximately midnight he inadvertently "bumped" a lady on his way to the lavatory, occasioning some words from defendant, who happened to be standing nearby. Defendant, according to Dix, was wear-

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

ing a light suit and black hat, and Dix again passed him on two subsequent trips to the bathroom. Dix and his party left the dance at approximately 2:30 a.m., April 12th. When outside the dance hall, he heard a shot, turned, and was struck by four bullets. Two other persons were also struck by bullets. Dix identified defendant as the person who, from six feet away, did the shooting, and further described defendant as wearing a light coat, black hat, and gray outfit. On cross-examination, Dix stated that he did not actually see the gun that shot him, although he saw defendant put something into his (defendant's) pocket and run.

Dix was the only witness who was able to identify defendant as the person who fired the gun. Bernice Collins testified that the gunman was wearing a three-quarter length light jacket and black hat and that he fled to a brown and black Buick Skylark with the license number CKC-966. James Carpenter, who was with Dix when the "bumping" incident occurred, testified that the man who spoke to Dix was wearing a wide black hat and that the gunman was wearing the same hat. Mattie Strickland agreed that the gunman wore a black hat and white trench coat, as did Nina Kellum; the latter also asserted that she had known defendant for four or five years, and that she saw him in the crowd outside the dance hall just before Dix was shot. Two brothers, Eddie and Melvin Donald, testified that while driving near the dance hall they saw, or heard, "some shooting", then saw the persons doing it get into a Skylark and speed away.

Officers Henry Hobson, James Price and William Washington of the Saginaw Police Department were on duty at the dance during the hours in question. Each testified that defendant was present

at the dance. On cross-examination, Hobson stated that he saw defendant "regularly" on the streets during April, May and June, but did not know there was a warrant out for defendant. An objection to "this line of questioning" was then sustained. Officer Price also admitted seeing defendant "a whole bunch of times" subsequent to April 12th and that he knew that defendant was a suspect in the case. Price then asserted that he was not aware that there was a warrant out for defendant, but a challenge to "When did you learn he was charged with this offense?" was sustained as hearsay.

Officer Edward Sanders was dispatched by radio to the dance hall after the shooting, and Officer DeLarum Savage was patrolling the area, heard shots, and proceeded to the scene. Both made investigations at the scene and at the hospital to which Dix was taken; Savage was given defendant's name by Officer Washington. After making their reports, neither Sanders nor Savage had anything further to do with the case. Objections were raised when they were asked when they learned that a warrant was issued for defendant; the objections were sustained, though Savage had already answered that he did not know.

Detective Vincent Rocchio was the officer who investigated the crime. On April 13, Rocchio talked to Mr. Dix at the hospital. At that time, Dix gave him the nickname "Blue", as being the name of his assailant. Rocchio testified that a Buick Skylark, license number CKC-966, was stopped shortly after the crime; that five or six persons were in the car when stopped; that all but the driver, Willie Shrivers, fled. Shrivers identified Johnnie Hose, Jimmie Johnson and Sylvester Brown as having been in the car; that Sylvester

Brown in turn identified McNeil Johnson (defendant's brother); and that Jimmie Johnson thought that six persons had been in the car, leaving one person unidentified.

On redirect examination Rocchio was asked why "it took so long to arrest the defendant"; he answered that a warrant was taken to defendant's home and given to defendant's father and that he (Rocchio) had heard on several occasions police radio calls indicating that defendant was at a certain location, but each time defendant "would take off running".

At this time defendant renewed his motion to dismiss based on the delay in his arrest, which the trial court denied.

The witnesses called by the defense were defendant himself, and one Dennis McKinney. Defendant asserted that at 10:45 p.m. on April 11th he went to a poolroom on the south side. There he played pool with McKinney, after which they drove in defendant's father's 1968 El Dorado to the dance at which Dix was later shot. Defendant further testified that he had not gone to the lavatory while at the dance, that he thought he was wearing a grey suit and light grey hat, and that he did not see William Dix or any of Dix's party at the dance. While he was walking away from the dance hall, he heard a gunshot, turned around and saw nothing but a crowd, continued on to his car and left. On cross-examination, defendant testified that although he was living at home on April 11th and thereafter, and was still living at home, his father did not tell him that a warrant had been delivered to his residence.

Dennis McKinney's testimony substantially agreed with defendant's. On cross-examination he admitted that he had been friends with defendant

for about eight years, that this was the first time he had told anyone that he was with defendant on the night in question, and that he had been previously convicted of certain criminal violations.

Among the witnesses called in rebuttal by the prosecution was John McAfee of the Saginaw Police. Officer McAfee testified that on May 28th, 1970, he and another officer saw defendant walking with his brother McNeil, but that defendant was able to elude them. On July 8, 1970, it was McAfee who arrested defendant.

The defendant raises two issues on appeal, which we consider in order.

I.

Did the delay of 87 days between commission of the crime and defendant's arrest deny defendant due process of law or a speedy trial?

The people assert that the only issue presented is one of due process and that defendant's claim that he was denied a speedy trial is not a proper issue. As to defendant's claim that he was denied due process, it is the people's position that defendant has failed to show any prejudice resulting from the delay in the arrest, and further that the defendant himself caused the delay. It is the people's further position that the refusal of the trial court to permit examination of some of the members of the Saginaw Police Department with regard to when they were aware that the defendant was wanted on a warrant was not prejudicial because defendant's nonavailability explains the delay and because the officers were not assigned to defendant's case.

Defendant asserts that he was denied due process and the right to a speedy trial, and that trial

counsel was improperly denied an opportunity to inquire into the reason for the delay. We determine that defendant's claim that he was denied a speedy trial is properly raised. We refer to the latest case on the subject, *Dickey v Florida,* 398 US 30, 40; 90 S Ct 1564, 1570; 26 L Ed 2d 26, 33 (1970), wherein Mr. Justice Brennan in his concurring opinion points out:

"I do not read the Court's opinion as deciding that * * * the defendant can challenge only delay occurring after his arrest. * * * The Court has as yet given scant attention to these and other questions essential to the definition of the speedy-trial guarantee."

We find further light on the subject in the case of *Mann v United States,* 113 US App DC 27, 29–30; 304 F2d 394, 396–397 (1962), wherein the Court held as follows:

"We accept appellant's premise that the Constitutional right to a speedy trial is properly enforced by dismissal of the charge when there has been prejudicial delay in bring[ing] the case to trial. *United States v Provoo,* 350 US 857; 76 S Ct 101; 100 L Ed 761 [1955], affirming *Petition of Provoo,* 17 FRD 183 [D Md, 1955]; *Taylor v United States,* 99 US App DC 183; 238 F2d 259 [1956]. * * *

"We note that in our view * * * the Constitutional guarantee [to a speedy trial] protects against undue delays in presenting the formal charge as well as delays between indictment and trial. The Supreme Court's affirmance of Judge Thomsen's ruling in *Provoo, infra,* seems to have settled the point. See also our opinion in *Taylor, infra.* In a non-capital case, it is true, mere delay in presenting the charge will rarely work a deprivation of the constitutional right, for permissible time in that instance is normally governed by the statute of limitations. Yet, if the delay is 'purposeful or

oppressive,' *Pollard v United States,* 352 US 354, 361; 77 S Ct 481; 1 L Ed 2d 393 [1956], even an indictment within the limitation period may come too late to square with the Sixth Amendment."

We rule that it is evident in the instant case that any delay from the date of the offense to the date of arrest was not purposeful or oppressive, and therefore did not violate defendant's right under the Sixth Amendment to the US Constitution, to a speedy trial. Also see *People v Rogers,* 35 Mich App 547 (1971).

Defendant cites the cases of *People v Hernandez,* 15 Mich App 141 (1968), and *Ross v United States,* 121 US App DC 233; 349 F2d 210 (1965), in support of his position that he was denied due process of law by reason of the delay of 87 days from the date of the crime to his arrest.

In the case of *People v Iaconis,* 31 Mich App 703, 712 (1971), we interpreted *Hernandez* and *Ross* as follows:

"I Whether a 165-day delay between the date of the alleged offense and the date of the warrant denied defendant the due process guaranteed him by the Michigan and Federal Constitutions, where MCLA 767.24; MSA 28.964 provides that the people may institute an indictment within 6 years of the alleged offense?

"Defendant cites the cases of *People v Hernandez,* 15 Mich App 141 (1968), and *Ross v United States,* 121 App DC 233; 349 F2d 210 (1965) to support his position that the delay denied defendant the due process guaranteed him by the Michigan and Federal Constitutions. The mere fact that the people delayed for 165 days after the offense before obtaining a warrant is insufficient evidence of prejudice to raise the issue of due process being denied the defendant under the Michigan and Federal Constitutions. We stated in *Hernandez, supra,* p 146:

" 'It is this evidence[1] of *prejudice* that results in the violation of due process which the court refers to in *Ross v United States,* 121 App DC 233; 349 F2d 210 (1965), *not the delay itself,* which is the guideline.'

"II Did the defendant make out a meritorious showing of some prejudice, and, if so, did the people present and show clear and convincing proof to the trier of fact: (1) that the delay was explainable, (2) it was not deliberate, and (3) no undue prejudice attached to the defendant under *People v Hernandez, supra,* pp 146, 147?"

Defendant contends that the delay between offense and arrest "had the effect of diminishing [his] opportunity to prepare a proper defense as the passage of time understandably dimmed his memory as to what he may have done and whom he may have seen at the time". And defendant also argues that the trial judge erred in not permitting him to inquire into the circumstances

---

[1] "Was it reasonable for this uneducated illiterate man to recall where he was, with whom he was, 'or what transpired 42 days previously? If, in fact, he were innocent, the more difficult it would be to recall the incidents of 42 days prior, under the facts herein. Should there have been a reasonable prompt notice of a complaint? Marked money was used, and never recovered. The only proof that defendant ever possessed such money was the bald testimony of a witness worthy of very little credence, at a time when it was within the grasp of the authorities to arrest this defendant and find the money in his possession, if indeed he ever possessed it. The facts in each case are to be fully considered and the balancing of interests must be weighed to determine whether there is a denial of due process. To do this in this case, we must consider the character and credibility of the witness, Alma Silva; the indication of a 'deal' between that witness and the prosecution; the lack of corroborating material evidence; the incapabilities inherent in defendant's character; the indignity and unnecessary severity of the manner in which defendant was arrested; the alleged fact that there was marked money used which was not recovered and the delay of 42 days before arrest of the defendant, an uneducated illiterate man.

"It is this evidence of *prejudice* that results in the violation of due process which the court refers to in *Ross v United States,* 349 F2d 210 (1965), *not the delay itself,* which is the guideline. No burden is imposed on the people until the defendant in the first instance makes out a meritorious showing of prejudice under the facts in the case, taking into consideration the alleged unwarranted delay." *Hernandez, supra,* at pp 146–147. [Footnote not in *Iaconis*].

related to the delay. We take the most favorable view of defendant's case and assume, *but do not determine* that his contention that he could not sufficiently recall the events of April 11th and 12th, 1970, to prepare a defense, is evidence of some prejudice. It is now necessary, according to *Hernandez,* to ask whether the delay was deliberate, whether it was explained, and whether undue prejudice resulted.

It cannot be said that the prearrest delay was either deliberate or unexplained. An attempt was made to arrest defendant at his home. The warrant was left with his father, and it is highly unlikely that defendant was unaware of it. On several occasions he eluded officers trying to apprehend him; as indicated in *People v Iaconis, supra,* one cannot complain of a delay which he helped create.

In considering whether defendant suffered undue prejudice under *Hernandez,* we point out that although defendant was not a scholar, he was not illiterate, as was the defendant in *Hernandez.* When asked by his counsel whether he could "recall the events of the evening of April 11 and the early morning hours of April 12", he answered, "Yes, I do", and he proceeded to testify at some length as to those events. Of all the questions asked him by his counsel, to only one did he respond that he could not remember; that he did "not really" recall what he had been wearing that night, but he thought it was a grey suit and dark grey hat. On cross-examination, defendant said that he could not remember what he had done between 3:45 p.m. and 10:45 p.m. on April 11th, nor whether McKinney or he had won the games at the poolhall, nor whom he had paid at the door of the dance, nor the kinds of cars he had seen on

leaving the dance. These lapses of memory hardly add up to undue prejudice. In short, defendant presented his alibi to the jury, which alibi was supported by the testimony of the person with whom defendant attended and departed the dance, and the jury chose not to believe it.

The victim was the only person who could identify defendant as the person who did the shooting, but defendant's brief nowhere suggests that the victim was entitled to "very little credence" as was the critical witness in *Hernandez*. Also, there were witnesses who substantiated the confrontation between defendant and Dix, described the hat and coat worn by defendant, and identified the gunman as wearing the same hat and coat.

In none of the prearrest-delay cases considered by this Court is there any indication that the defendant had notice of a warrant substantially in advance of the day on which he was arrested. In *Hernandez*, a warrant was issued 39 days after the crime and defendant was arrested 3 days later. In *Iaconis*, defendant complained only of the 165 day delay between the crime and issuance of warrant. In the instant case, the warrant was issued 16 days after Dix was shot, which warrant was thereafter made known to defendant's father. Defendant's conduct during the 87 days between crime and arrest raises a strong inference that he had notice of the warrant some time before he was arrested; in fact, he ran from Officer McAfee on May 28th, approximately a month and a half after the crime.

Defendant has failed to show any undue prejudice resulting from the delay from date of offense to date of arrest.

## II.

Did the prosecutor violate defendant's right

against self-incrimination by asking on cross-examination if defendant had previously told his "version of the story" to anyone and then, during final argument, commenting upon the fact that defendant had not done so; and, if defendant's right against self-incrimination was violated, did he fail to preserve the error for appeal by not objecting, requesting curative instructions, or moving for a mistrial?

Defendant asserts that while an accused who takes the stand is subject to cross-examination, it is reversible error to permit cross-examination which shows that defendant exercised his privilege to remain silent. The portions of the record to which the defendant now objects are as follows:

*"Q. [By Mr. Hauffe, prosecutor]:* Mr. Johnson, did you ever make an effort, knowing that you have been accused of this crime, at least since September 1, telling anyone this version of the story?

*"A.* Would you repeat that.

*"Q.* Did you ever make an effort to tell the police, the prosecutor, or any official parties this version of the story, your version of the story?

*"A.* Have I ever tried to?

*"Mr. Stroebel [defense attorney]:* Your Honor, I'll object to this.

*"The Court:* I think I'll sustain the objection."

During final argument *(by Mr. Hauffe, prosecutor):*

"Remember also that yesterday the defendant and his friend testified—but by their own admission that was the first time ever that they had ever told this version of the story to anyone: police, prosecutor or anyone. Don't you think that's a little strange?"

It is true that it would have been reversible

error if the court had allowed cross-examination of the defendant which showed that defendant exercised his privilege to remain silent. *People v Hicks,* 22 Mich App 446 (1970); *People v Graham,* 386 Mich 452, 458 (1971); *People v John Willie Williams,* 26 Mich App 218 (1970); and *People v Seales,* 16 Mich App 572 (1969). However, in the instant case the trial court denied the cross-examination of the defendant as to the objected-to evidence, and further, the defendant did not object to the final argument at trial, ask for a corrective instruction, nor move for a mistrial. We therefore rule that the defendant failed to preserve the error for appeal. *People v Willis,* 1 Mich App 428 (1965); *People v McLaughlin,* 3 Mich App 391 (1966).

In any event, we are constrained to come to the conclusion that after an examination of the entire record, and considering the fact that defendant did not object to the now objected-to comments of the prosecuting attorney, that the error complained of has not resulted in a miscarriage of justice. MCLA 769.26; MSA 28.1096. *People v Green,* 7 Mich App 346, 354 (1967).

Affirmed.

All concurred.